**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Stephanie Hannon,

    *Plaintiff,*

v.

City of Prospect Heights, an Illinois
municipal corporation; Joe Wade,
individually, and Scott Williamson,
individually,

    *Defendants*

No. 18 C 2475

Judge Lindsay C. Jenkins

**MEMORANDUM OPINION AND ORDER**

Plaintiff Stephanie Hannon ("Plaintiff" or "Hannon") brings suit against the City of Prospect Heights, Illinois ("City"), City administrator Joe Wade ("Wade") and City alderman Scott Williamson ("Williamson") for employment discrimination and retaliation arising out of the City's decisions to convert Plaintiff's finance director position from part-time hourly to full-time salaried, to terminate Plaintiff when she refused to work more hours for less money, and to outsource the City's finance department to an outside firm. Currently before the Court is Defendants' motion for summary judgment [Dkt. 160]. For the following reasons, the motion is granted in part and denied in part.

Summary judgment is granted in favor of Defendants on Plaintiff's claims for retaliation in violation of the Equal Protection Clause (Count III); Title VII (Count IV), the Illinois Human Rights Act (Count V); and the First Amendment (Count VI). Summary judgment is otherwise denied. The claims that remain to be tried are Plaintiff's § 1983 equal protection claim against the City, Wade and Williamson

(Count I); the Title VII gender discrimination claim against the City (Count II); the Illinois Whistleblower Act claim against the City (Count VII); and the claim against the City for common law retaliatory discharge (Count VIII). Finally, Defendants are not entitled to qualified immunity on the § 1983 claims.

## I.    Background

The following facts are taken from the parties' Local Rule 56.1 statements and accompanying exhibits [Dkts. 144, 148, 162, 166, 167, 174] and are undisputed except where a dispute is noted. Hannon was employed by the City as its finance director from December 2011 until her termination in June 2017. During her time at the City, the mayor was Nicholas Helmer ("Mayor" or "Helmer"), who began in 2011, and the City administrator was Wade, who began in 2015. The City has five aldermen who each serve four-year terms. Defendant Williamson was an alderman from 2009 to May 2019. The other aldermen during the relevant period were Pat Ludvigsen (2003 to November 2020), Larry Rosenthal (May 2015 to April 2019), Lora Messer (May 2015 to April 2019), and Matthew Dolick (June 2016 to present).

It is disputed whether the Mayor and Williamson were political opponents. Defendants assert and point to testimony that the mayor and council members "did not run on a slate and would support each other on certain issues and on other issues, elected officials may not fully agree with each other on policy." [Dkt. 166, ¶ 12.] Hannon disputes this and points to testimony from the Mayor and others that Alderman Williamson was the political opponent of the Mayor, particularly on issues concerning a large parcel of land in the City known as the "Arena property," [See *id.*].

Hannon was hired as the City's finance director by Anne Marrin ("Marrin"), who was the city administrator before Wade. Hannon was hired on a part-time, contract basis, but the exact terms of the agreement are disputed. Defendants assert based on Hannon's deposition that her position was budgeted for up to 1,500 hours per fiscal year. [See Dkt. 166, ¶ 14.] Hannon takes the slightly different position that Marrin hired her on a "part-time, contract basis for somewhere between 1000 – 1500 hours per year" and that the number of hours was not specific. [*Id*. ¶ 13.] Once Hannon exceeded 1,000 hours in a year, she began receiving vacation and sick time per the City's policy. [*Id*. ¶ 14.] When she was initially hired, Hannon did not receive health insurance and paid for it on her own, but she eventually became eligible for insurance under the Affordable Care Act. [*Id*.] Defendants characterize Hannon's position as "averaging" 30 hours per week, but Hannon argues that the average is irrelevant because the number of hours required varied depending on the time of year; for instance, she worked more during budget time, but during most of the year would work 20 hours or fewer. [*Id*.] Hannon was not required to obtain permission to work more than 30 hours per week. [*Id*., ¶ 16.]

One of Hannon's job responsibilities was to assist with preparing the City's annual budget. In each year of Hannon's employment with the City, her compensation exceeded the amount budgeted. [See Dkt. 166, ¶¶ 15, 17, 18, 19.] More particularly, her budgeted salary for the 2012 fiscal year (a partial year) was $24,375 and she estimates actually earning $42,363. [*Id*., ¶ 17.] Her budgeted salary for the 2013 fiscal year was $81,120 and she estimates actually earning $102,481. [*Id*., ¶ 18.]

3

The budgeted salary for the 2014 fiscal year was $91,000 and Hannon estimates actually earning $126,306. [*Id.*, ¶ 19.] Hannon attributes the overages to additional work she was given to complete, which meant frequently working additional hours. [*Id.*, ¶ 18.] Hannon emphasizes that during fiscal year 2014, she was required to perform her usual job functions while also performing additional work at the request of interim city administrators and certain functions typically performed by others due to turnover, including the departure of the Assistant to the City Administrator who resigned in 2014. [*Id.*, ¶ 19.] According to Hannon, City Council approved her hiring, her part-time status, and her hourly rate. Her timesheets, payroll change forms and hourly rate increases were all approved by various City administrators. [*Id.*, ¶ 18.]

In 2014, the City promoted Kimberly Trausch ("Trausch") from front desk administrative assistant to financial analyst working under Hannon. Trausch took over payroll at some point, though it is not clear when. During Marrin's tenure as City administrator, Marrin questioned Hannon whether the finance director position would be full-time, and Hannon relayed that it was part-time. [Dkt. 166, ¶ 20.][1]

In Spring 2014, Marrin took a new job in Fox Lake and gave her notice to the City. Before she left, Alderman Williamson commented to Marrin that he was going to hire a man to replace her and pay him more money. [See Dkt. 167, ¶ 21.] Williamson did not recall making this statement, but says if he did he would have

---

[1]     Defendants assert that "Marrin was aware that the aldermen were questioning why Hannon's hourly rate was higher than if a salaried person was in that position," [Dkt. 166, ¶ 21], but the testimony on which they rely (that of an attorney named Mike Zimmerman discussed below) is vague and does not mention Marrin; and the testimony by Police Chief Jamie Dunne concerning a conversation Dunne allegedly had with Marrin about a conversation Marrin had with unidentified council members is double hearsay. [See *id.*]

been joking; Marrin also described Williamson as "kind of a jokester." [*Id.*] Following Marrin's departure, several people held the City administrator role, either on an interim or permanent basis, including Jamie Dunne, Ken Lopez and Bill Balling ("Balling"), who served as the City's interim administrator from June 2014 until Wade was hired.

In August 2014, Marrin (who, by then, was working as the Village of Fox Lake's administrator) hired Hannon as Fox Lake's part-time, hourly finance director/ treasurer. Mayor Helmer and Balling approved Hannon working at Fox Lake as long as it did not conflict with her work for the City. [Dkt. 166, ¶ 46.] Hannon was initially hired at Fox Lake to work approximately 1,000 hours per year, but her hours increased shortly after she was hired. [*Id.*, ¶ 47.]

Alderman Ludvigsen regularly dealt with budgets in his career and as a result, became the "budget person" on City Council. [*Id.*, ¶ 32.] In his declaration, Ludvigsen states that by summer 2014, he had "noticed a discrepancy between the budgeted amount for [Hannon's] position and the amount she actually earned." [Dkt. 144-17, ¶ 6.] He began inquiring about this discrepancy by February 2015. While at City Hall (which he "would try" to visit "multiple times per week to check mail and speak with City employees"), Ludvigsen "increasingly … did not see [Hannon] in the office which frustrated [him] because [he does] not like to use the phone or email and prefer[s] in-person contact with employees." [*Id.*, ¶¶ 13-14.] It is disputed exactly when and with whom Ludvigsen discussed his concerns, and whether Ludvigsen questioned whether

the finance director position should be full-time rather than part-time given the amount the City was paying Hannon. [See Dkt. 166, ¶¶ 32, 33.]

Hannon testified that sometime in 2015, Balling told her that her compensation was going to be discussed at a Board meeting and that Aldermen Williamson and Ludvigsen had requested that it be a topic. [Dkt. 144-5 at 28 (Tr. 111:15-112:12).] Afterwards, Hannon and Balling discussed the council meeting and "we were going to try and determine a way to hopefully reduce the number of hours" Hannon had. [*Id*. (Tr. 112:13-23).]

Wade became the City's administrator in June 2015. For the 2015 fiscal year, Hannon's budgeted salary was $107,250 based on 1,500 hours; Hannon estimates actually earning $147,093.38 that fiscal year. [Dkt. 166, ¶ 29.] Defendants assert, but Hannon disputes, that Hannon knew that she would exceed the 1,500 hours budgeted for 2015. Hannon maintains that she worked more than anticipated due to staffing changes including the loss of the Assistant to the City Administrator and the turnover of four administrators in a year and a half. [See *id*.]

At some point after Wade became administrator, Williamson called Wade to discuss his belief that Hannon was not transparent about her compensation and asked why the finance director position was not full-time salaried. [See Dkt. 166, ¶ 35.] Wade testified that this occurred in the summer of 2015 and that it was after he became aware that Hannon had been questioning billing practices for legal services performed by the City's outside counsel, the Tressler law firm (the "Tressler firm") where Attorney Mike Zimmerman ("Zimmerman") was a partner. [See Dkt. 144-20 at

6

10-13; Dkt. 144-12 (Tr. 36:6-24)]. After speaking with Williamson, Wade asked Hannon why she wasn't full-time because her timesheets consistently reflected 80 hours or so.[2]

Sometime in the Fall of 2015, Williamson told Wade that Hannon improperly interjected her opinion during discussions between council members. [See Dkt. 167, ¶ 26.] Hannon interpreted this as related to her gender and testified that Williamson also said to Wade that Hannon did not "know her place" and that he did not want to sit next to her [*id*.; see also *id*. ¶ 42]. Hannon testified, and Wade denied, that Wade required Hannon's work product to be reviewed by outside auditors but did not impose similar requirements on male directors and that Wade would schedule meetings on short notice to make her attendance difficult or impossible and cancel meetings without providing notice. [*Id*., ¶¶ 29, 30.]

Hannon's budgeted salary for the 2016 fiscal year was $119,500 based on 1,500 hours, and she estimates actually earning $146,108.01 in the 2016 fiscal year. *Id*., ¶ 37.] According to his declaration, Alderman Ludvigsen spoke during a budget meeting in the Spring of 2016 regarding his belief that the budget should show Hannon's compensation. [*Id*., ¶ 38; see also Dkt. 144-17, ¶ 19.][3]

---

[2]    Hannon admits this conversation occurred but says that it was not until 2016. [See Dkt. 166, ¶ 35]. The transcript of Wade's deposition indicates that it was in the summer of 2015. [See Dkt. 144-12 (Tr. 36:6-24 (questioning Wade about an interrogatory response that stated the phone conversation between Wade and Williamson occurred in summer 2015)]. Hannon's citation to her own transcript is not helpful, because the cited testimony concerns a conversation she allegedly had with Balling in 2015—not Wade in 2016. [See Dkt. 144-5 at 18 (Tr. 111:15-112:12).]

[3]    Hannon disputes this on the basis that "compensation for specific employees was typically discussed only in executive sessions and not in budget workshops or other public meetings." [Dkt. 166, ¶ 38]. This does not create a material factual dispute: Hannon does not

At various times, Mayor Helmer and Hannon were in conflict with the City's outside attorney, Zimmerman and the Tressler firm, about Zimmerman's bills. It was Hannon's job to "code" invoices from outside vendors [Dkt. 166, ¶ 57], and she had long questioned Zimmerman's billing practices. [See *id.*, ¶¶ 59-61.] For instance, Police Chief Al Steffen testified that Hannon "vent[ed] to him that she would draft ordinances that Zimmerman did not like and he would rewrite them and she felt that Zimmerman was billing too much and was taking too long on some legislation." [*Id.*, ¶ 61.] According to Hannon, this resulted in a confrontation between her and Zimmerman in 2015. [See *id.*, ¶ 59.] In Spring 2016, Mayor Helmer was upset about how much the Tressler firm was billing the City for legal services. [*Id.*, ¶ 65.] Helmer, acting on his own, issued a request for proposal ("RFP") for legal services, believing it was time to change firms, which allegedly displeased City Council. [*Id.*, ¶ 66.]

On June 7, 2016, Hannon emailed Mayor Helmer and Wade alerting them that a Tressler invoice included time for a second attorney to attend City Council meetings. Hannon believed that these charges should not have been included on the bill because Helmer and Zimmerman had a verbal agreement that the firm would not charge for a second attorney at such meetings. [*Id.*, ¶ 67.] According to the legal services agreement, the Mayor had "authority to agree that Tressler lawyers do not need to attend certain meetings if after consultation with Tressler lawyers, [the Mayor] deems it not an efficient use of the City's legal services." [Dkt. 144-20 at 12.] Defendants take the position that the agreement did not prohibit billing the City for

---

claim that specific employees are *never* discussed in executive sessions and she has no personal knowledge of what occurred at the Spring 2016 budget meeting.

more than one attorney to attend. Ultimately, Zimmerman called the error a clerical mistake, apologized, and reduced the bill by $2,556. [Dkt. 166, ¶ 68.] Mayor Helmer and Hannon believed it was not a mistake, in part because there was a process to prevent such issues and because there had been two errors in a row. [Dkt. 166, ¶¶ 68-69.] In a June 7, 2016 email to Hannon and Wade, Mayor Helmer called Zimmerman's bills "fraudulent" and suggested that the matter be referred to the Attorney Registration and Disciplinary Committee ("ARDC"). [See Dkt. 166-19; Dkt. 167, ¶ 35.]

Sometime in the Spring or Summer of 2016, while Hannon was on vacation, Wade, in consultation with Williamson, asked the City's financial analyst, Trausch, for Hannon's time records. [Dkt. 166, ¶¶ 39-40.] According to Williamson, he had been trying to obtain the records for some time but nobody would provide them. Hannon disputes this on the basis that Trausch (the only person besides Hannon who was involved in payroll) testified that she never dealt with Williamson. [See *id.*] When Hannon returned from vacation, Wade told Hannon that the council was going to discuss her compensation at the next board meeting. [See *id.*, ¶ 39.] According to Hannon, Wade said, "if you throw dirt in the air you never know where it will land," which Hannon interpreted as a threat to her job in retaliation for her and the Mayor questioning Zimmerman's bills. [*Id.*, ¶ 37.]

Defendants dispute this. According to them, Wade said "when dirt rises, it flies," which Wade meant "as referring to the environment at the City." [Dkt. 166, ¶ 77.] After Hannon complained about Zimmerman's bills, Wade told her she was no

longer permitted to review attorney bills during the investigation of her allegations. [Dkt. 167, ¶ 38.]

Two City Council executive sessions are relevant to this case. One was held on July 25, 2016, and the other on August 22, 2016. The sessions, which were transcribed, were attended by Mayor Helmer; The City Clerk, Wendy Morgan Adams; Aldermen Messer, Rosenthal, Williamson, Ludvigsen and Dolick; City administrator Wade; and attorney Zimmerman, among others. [Dkt. 146 at 63; Dkt. 174 at 4-5.]

Hannon testified that prior to the July 25, 2016 executive session: (a) Mayor Helmer "informed [her] that they were going to go into executive session to discuss my salary, and he told me that they thought – he thought that it was related to my gender, and that I made too much money." [Dkt. 157-5 at 57 (Tr. 228:2-6)]; and (b) Williamson accused Hannon of creating a biased analysis of the sale of the large parcel of land known as the "Arena" in favor of the Mayor's position. [Dkt. 167, ¶ 5.]

According to the transcript of the July 25 session, Williamson introduced the topic of Plaintiff's compensation, stating that he would "like to discuss compensation" for the finance director because "[w]e've been looking for ways to save money." [Dkt. 148 at 64 (Tr. 3:14-18).] He began by discussing the details of how Hannon's billed hours had exceeded her budgeted hours for several years. He brought up the fact that she was also working at Fox Lake and opined that working both jobs "doesn't equate to something that's sustainable over time." [*Id.* (Tr. 4:17-18).] Williamson continued that he would "like to get us either in a position where we are down at that 1,500 hours or we stop her full-time (sic) employment and say, hey, we'd like to have you

10

here 40 hours a week five days a week in office, and, you know, approach it that way." [*Id*. (Tr. 4:19-5:1).] He stated that he had "looked into other communities and other communities are offering that same position full-time with a lot less than what we're giving [Hannon]," which he claimed to be $168,000. [*Id*. (Tr. 5:1-6).] He then opined that of the two options available—capping Hannon's part-time hours or making her position full-time salaried—he preferred the full-time option because he would "like to have somebody that is at our disposal and is not moonlighting on our time." [*Id*. at 65 (Tr. 7:2-4).]

Alderman Messer asked, "what would the average range be that we would offer to someone," if the job were posted as a full-time position. [*Id*. at 66 (Tr. 13:3-7).] Williamson responded that Glen Ellyn was "paying just over $100,000 for someone that's been doing it for ten years." [*Id*. (Tr. 13:8-11).] City Clerk Adams suggested looking at the pay rates in other communities to "really see what the average is." [*Id*. (Tr. 13:16-19).] Wade opined that the average was "probably a range of 125 to 135,000." [*Id*. at 67 (Tr. 14:6-7).] He also said that one option would be to scale back the part-time position, so Hannon was working fewer hours. [*Id*. at 67 (Tr. 14:14-23).] Williamson responded that Hannon had been billing full-time hours for years and was an efficient worker, so "we should have her full-time" because "it's obviously not a 30 hour a week position." [*Id*. (Tr. 15:10-17).] Messer asked, "[a]nd you don't think full-time at 170,000?" [*Id*. (Tr. 15:18-19).] Ludvigsen stated, "I mean, she's probably in the 150,000, 40,000 ballpark." [*Id*. (Tr. 16:6-7).] Mayor Helmer interjected that "125 is pretty much what I've run into in our business." [*Id*. at 67-68 (Tr. 18:12-19).]

11

There was also a brief discussion of whether Hannon was accessible given her work schedule, [see *id*. at 68], and it is disputed whether anyone ever had trouble reaching Hannon when she was working at Fox Lake rather than at City Hall. [See Dkt. 166, ¶ 78.]

Adams questioned whether Hannon would be interested in a full-time schedule and if she would quit if forced to work full-time, because "she probably likes the schedule she has." [Dkt. 148 at 69 (Tr. 22:7-16).] Adams also questioned whether there was a possibility of cutting down certain tasks that Hannon, such as traffic ticket appeals. [*Id*. at 72 (Tr. 34:22-36:2).] Ludvigsen said it wasn't a "good thing" to have the same person be finance director of two towns and that Hannon had been given a part-time position "frankly, … because she wanted to be home with her kids and (inaudible) work two places." [*Id*. at 69 (Tr. 24:3-6).] Zimmerman also weighed in about whether Hannon's position should be full-time or part-time. He pointed out that she "make[s] six figures at each job, moonlighting" [*id*. at 70 (Tr. 28:21-22)], questioned whether the City was "getting peak efficiency" from Hannon [*id*. (Tr. 29:17-22)], and questioned her status as an exempt employee under IRS rules. [*Id*.]

Mayor Helmer questioned why the City would want to prevent Hannon from being able to work in a second municipality. [*Id*. at 73 (Tr. 40:24-41:14).] He also opined that Hannon would quit if the City required her to work full time and prohibited her from also working in Fox Lake; Adams agreed. [*Id*. at 74 (Tr. 42:22-43:3).] Toward the end of the meeting, Messer summarized that "I think the big thing is we want someone here Monday through Friday our hours." [*Id*. (Tr. 43:19-21).]

12

Adams noted that "we got a lot of variation on this" and Helmer told Wade, "Joe, you're the man," "You're going to bring home the bacon here," "We'll take care of this and don't lose her." [*Id.* (Tr. 44:1-7.)] The council broke for summer recess. No vote was taken.

Following the executive session, Wade told Hannon that the City and council were going to ask her to work full time, work more hours at a lesser rate, and require her to work in person at the City. [Dkt. 166, ¶ 80.] Mayor Helmer also met with Hannon after the executive session. According to Hannon, Helmer told her that he believed the counsel was changing her salary terms "because she had supported him and he thought it was a matter of a woman making more money than other, male employees and that Wade thought her salary should be between $80-90,000 and the council had talked about $125,000." [*Id.*, ¶ 81; see also Dkt. 167, ¶ 86.] Helmer testified that he "couldn't recall" making the comment about gender, but also stated that he personally believed that Williamson discriminated against Hannon because of her gender. [Dkt. 166, ¶ 81.] Hannon also stated in interrogatory responses that Helmer told her, "I am going after Mike [Zimmerman] and they are now coming after you." [Dkt. 167, ¶ 86.] Hannon also testified that Helmer allegedly told the council in executive session that "if you decide to make budget cuts, you don't only look at one line item." [*Id.*, ¶ 87.]

On August 2, 2016, Hannon emailed Helmer and Wade requesting an investigation into whether she was being retaliated against for questioning Zimmerman's invoice. [Dkt. 166,¶ 82.] Hannon "believed that the questions regarding

13

her pay or salary were related to her gender and that a woman was making too much money because Mayor Helmer told her that the city council was going to go into executive session to discuss her salary and he thought that it was related to her gender and that she made too much money." [*Id.*, ¶ 83.]

The second executive session was held on August 22, 2016. [See Dkt. 174.] The last topic of that meeting was Hannon's complaint and request for an investigation. Ludvigsen summarized that at the last executive session, "I believe we discussed offering her full-time employment, no moonlighting, and Joe [Wade] was going to establish a salary range and make that offer." [*Id.* at 97.] Ludvigsen stated that he "believe[d] in that meeting we all talked about how good a job she did, but we want her –want her full-time, Monday through Friday, you know, 8:30 to 5, whatever the hours may be[.]" [*Id.*] Wade testified that "[t]he direction of the city was to provide an employment structure of regular city hall hours, Monday through Friday, 8:30 to 5, and then also recognizing that the rate of pay that she had previously was – in recognition it was based on a 1500 or 1600 hours a year" and "the expectation is that the rate – the hourly rate of pay would go down, so you wouldn't have an employee approximately at $160,000 a year or so." [*Id.* at 98-99.]

Wade stated that he had not given Hannon an offer "in writing" and that he intended to "go[ ] back to the council, too, because it was also – the discussion was what – what's the right salary." [*Id.* at 138.] Ludvigsen questioned, "Is it something that we're comfortable allowing her to keep doing her job while this [investigation] is going on," and asked, "can we agree that if you're going to be having conversations

with her, have [the City's attorney] in the room" and "[m]ake sure the door is open." [*Id.* at 143; see also *id.* at 167, 175.] Zimmerman opined that Hannon was using her claims of gender inequality and retaliation as "a little bit of a grenade" in the hopes of a job offer. [*Id.* at 167]. He later added that Mayor Helmer would be "out of your mind to offer her full-time." [*Id.* at 170]. At the end of the meeting, Zimmerman summarized that the consensus was to hire an outside law firm without a connection to the Tressler firm, Hannon, or the City to advise Wade on next steps in investigating Hannon's claims. [*Id.* at 172-73; see also *id.* at 178.]

After the executive session, Zimmerman gave the City the names of outside firms that could serve as legal counsel, including Jane McFetridge ("McFetridge"). McFetridge recommended Alisa Arnoff serve as the investigator, which she did beginning in October 2016. See [Dkt. 166, ¶ 84; Dkt. 167, ¶ 50.] Hannon is critical of the investigation arguing, among other things, that it was tainted based on Zimmerman's continued involvement throughout the investigation, pointing to privilege log entries and an email from McFetridge to Wade referring to putting together a "gameplan" with Zimmerman. [See *id.* ¶ 51; Dkt. 166-54 at 1.] Zimmerman denies being involved in the investigation. It is also disputed whether Arnoff sent Wade a draft of the investigative report. [Dkt. 167, ¶ 55.] Wade maintains that he did receive a draft (a fact that Arnoff denies), but Wade denies making any suggestions or changes. [*Id.*]

On January 19, 2017, Hannon filed a charge of discrimination with the Illinois Department of Human Rights. [Dkt. 166, ¶ 87.] About a week later, on January 25,

2017, Arnoff submitted her report to the City. [See *id.*, ¶ 84; see also Dkt. 148 at 21-62.] Arnoff's report was addressed to "City Administrator Joe Wade and Attorney Jane McFetridge." [*Id.* at 21.] As to the investigation into Hannon's complaints about Zimmerman and his allegedly fraudulent billing, Arnoff concluded that "neither Zimmermann nor Tressler LLP was trying to defraud the City." [*Id.* at 41.] As to a potential Whistleblower Act claim by Hannon, Arnoff concluded that Hannon "did not reasonably believe she reported a violation [of federal or state law] at the time she made her report; she was aware that Mr. Zimmerman did not include charges for the mere presence of a second attorney at City Council meetings on his invoices as a matter of practice. Her motivations, if any, were likely prompted by Mayor Helmer or her previous disagreements with Mr. Zimmerman. Ms. Hannon is an intelligent woman. She had to have known this was a billing error." [*Id.* at 60.] As to Hannon's complaint of gender discrimination, Arnoff concluded the City "has a legitimate reason for discussing, and even changing, her flexible work hours and compensation" and that Hannon could not provide evidence "that a reduction in her compensation is unreasonable given that the City is a non-home rule municipality." [*Id.* at 61.]

Of note in the report was that (a) Williamson told Arnoff that he wished his wife made as much as Hannon did.[4] [Dkt. 148 at 51]; and (b) Mayor Helmer told the investigator that "the basis for the July 25, 2016 Executive Session was, in his opinion, the issue of women making too much money." [*Id.*, ¶ 73.]

---

[4]    Williamson did not recall making the same statement to Hannon but admitted that he may have made it to others. [See Dkt. 167, ¶ 22; see also Dkt. 157-4 (Tr. 13:8-22).]

On March 1, 2017, Wade and Alderman Messer met with Hannon. At the time of the meeting, they knew that Hannon had filed a charge of discrimination with the IDHR and had notice of her complaints. [Dkt. 166, ¶ 87; Dkt. 167, ¶ 88.] Wade presented Hannon with an offer of full-time employment at $125,000, which was $20,000 less than she was making at that time for 1,500 hours per year. [See Dkt. 166, ¶ 85.] Hannon asserts, but Defendants dispute, that Hannon was advised that the offer was due to budgetary reasons and she would be terminated if she did not accept. [Dkt. 167, ¶¶ 81, 89.] All of the male directors (all of whom were full-time employees) received a 3% pay increase in the 2017-2018 proposed budget. [*Id.* ¶ 89.]

Hannon provided Wade with a list of the salaries for finance directors in other municipalities that she considered comparable. The City rejected her list and offered its own. [See Dkt. 166, ¶ 86.] Defendants maintain that the fact that Hannon worked at Fox Lake "wasn't the issue," but rather "[t]he issue was that she was to give up and be full time on regular business hours, like everyone else was serving here at the city hall." [*Id.*, ¶ 88] Hannon disputes this. [*Id.*]

On March 13, 2017, Hannon rejected the job as offered. She also suggested that it violated the City's ordinance establishing the finance director job as part-time and was not in line with comparable communities. [See Dkt. 166, ¶ 89.] The next day, Wade informed Hannon that the City would begin looking for a replacement finance director, and thereafter advertised and interviewed replacement candidates. [I*d.*]

On April 3, 2017, Hannon informed Wade that Trausch, the financial analyst working under Hannon, was resigning effective April 13, 2017. [*Id.*, ¶ 95.] At the time

of her resignation, Trausch was making approximately $63,000 per year. [*Id.*] According to Hannon, at the time Trausch quit, "the City informed me that I would no longer be their finance director, that I needed to take full-time employment or else I would be fired, and [Wade] told me that my hours would be reduced until I was— until my final days[.]" [Dkt. 166-5 at 14 (Tr. 56:2-14).]

Instead of replacing Hannon and Trausch, the City hired an outside firm, Lauterbach & Amen ("L&A"), to handle the City's finance function. [Dkt. 166, ¶ 96.] On May 31, 2017, Wade sent Hannon an email informing her of this decision and inquiring whether she would be willing to spend a "transitional day" with L&A when they began their assignment with the City on June 5, 2017. [See Dkt. 166-27.] Hannon's termination took effect that same month. [*Id.*, ¶ 1.].

L&A were hired at an initial quoted cost of $225,000 per year. [Dkt. 166, ¶ 97.] Defendants take the position that this was expected to save the City $50,000 to $60,000 per year, but this is disputed. [See Dkt. 166, ¶ 98; Dkt. 167, ¶ 69.] Based on her own declaration, Hannon claims that the City spent $107,000 more from 2018-2021, and also emphasizes that L&A wasn't collecting outstanding city citations, which totaled over $1.3 million. [Dkt. 167, ¶ 70.]

Under the L&A Agreement, L&A consultant Michael Ducharme served as the City's finance director and Cheri Graefen was his assistant. [See Dkt. 166, ¶ 100.] Ducharme was only in the office two days a week; when he was unable to attend staff meetings, another employee from L&A would attend. [See Dkt. 167, ¶¶ 31, 68.] Ducharme and Graefen each averaged less than 20 hours per week on the City's

18

account. [*Id.*, ¶ 67.] In 2020, L&A reassigned Ducharme to another village and Graefen took over as finance director for the City. Other accounting and finance employees at L&A also performed some work for the City and were available to meet the City's needs. [See *id.*]

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); see also *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532 (7th Cir. 2013) (citation omitted). The Court "'may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder.'" *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003)).

Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of events." *Wade v. Ramos*, 26 F.4th 440, 446 (7th Cir. 2022) (quoting *Schacht v. Wis. Dept' of Corr.*, 175 F.3d 497, 504 (7th Cir. 1999)). A party opposing summary judgment must go beyond the pleadings and "set forth specific facts showing that

there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## II.    Analysis

Hannon's second amended complaint [Dkt. 33] contains a § 1983 equal protection claim against the City, Wade and Williamson (Count I); a Title VII gender discrimination claim against the City (Count II); a § 1983 equal protection retaliation claim against the City, Wade and Williamson (Count III); a Title VII retaliation claim against the City (Count IV); a claim against the City for retaliation in violation of the Illinois Human Rights Act (Count V); a § 1983 First Amendment retaliation claim against the City, Wade and Williamson (Count VI); a claim against the City for violation of the Illinois Whistleblower's Act (Count VII); and a common law retaliatory discharge claim against the City (Count VIII). Defendants seek summary judgment on all claims and the individual Defendants assert qualified immunity on the § 1983 claims.

20

### A.    Gender Discrimination

Hannon brings a Title VII claim against the City (Count II) and a § 1983 equal protection claim against the City, Wade and Williamson (Count I) based on allegations that she was terminated due to her gender. The governing complaint alleges that Wade and Williamson discriminated against female employees [see Dkt. 33, ¶¶ 100, 101], that Wade allegedly used his authority to terminate Hannon on the basis of her gender or, alternatively, acted as a "cat's paw" in recommending that the City terminate Hannon and/or dramatically reduce her wages and increase her work hours [*id.*, ¶¶ 103-104], and that Williamson allegedly participated, encouraged, and helped carry out the pay decrease and Hannon's termination or, alternatively, acted as a cat's paw to encourage the other City Council members to carry out materially adverse employment actions against Hannon. [*Id.*, ¶¶ 105-106.] According to the complaint, Wade and Williamson were both "final policymakers" who intentionally discriminated against Hannon based on her gender by giving more favorable treatment (raises, retention and hiring) to male employees. [*Id.*, ¶¶ 109, 110; see also *id.* ¶ 114 (incorporating by reference the allegations of the § 1983 claim into the Title VII discrimination claim).]

In their summary judgment briefs, the parties group the Title VII and § 1983 equal protection claims and, for the most part, analyze them together. This is understandable, since the Seventh Circuit has repeatedly explained that "[d]iscrimination cases brought under § 1983 are governed by the same legal standards as those brought under Title VII." *Bless v. Cook Cnty. Sheriff's Office*, 9

F.4th 565, 574 (7th Cir. 2021) (citing *Steinhauer v. DeGolier*, 359 F.3d 481, 483 (7th Cir. 2004)). Because there are several key differences between the two types of claims, which require separate discussion, the Court will begin with the Title VII claim and then turn to the § 1983 equal protection claim.

### 1. Title VII

"Under Title VII, an employer may not 'discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" 42 U.S.C. § 2000e-2(a)(1). "If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee—put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred." *Bostock v. Clayton Cnty., Georgia*, 140 S.Ct. 1731, 1741, -- U.S. -- (2020). At the summary judgment stage, the question is "'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's [membership in a protected class] caused the discharge or other adverse employment action.'" *Wince v. CBRE, Inc.*, 66 F.4th 1033, 1040 (7th Cir. 2023) (quoting *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)); see also *Nigro v. Indiana Univ. Health Care Assocs., Inc.*, 40 F.4th 488, 491 (7th Cir. 2022); *Purtue v. Wisc. Dep't of Corr.*, 963 F.3d 598, 602 (7th Cir. 2020).

"Plaintiffs often will seek to carry their evidentiary burden by using the familiar *McDonnell Douglas* framework," *Nigro*, 40 F.4th at 191, which is intended to "'clarify and simplify'" the task of proving causation. *Joll v. Valparaiso Community*

*Schools*, 953 F.3d 923, 929 (7th Cir. 2020) (quoting *Coleman v. Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring)). Under this framework, the plaintiff has the "initial burden to establish a *prima facie* case of discrimination" by showing that 1) she is a member of a protected class; 2) she was meeting her employer's legitimate job expectations; 3) she suffered an adverse employment action; and 4) similarly situated employees outside the protected class were treated more favorably. *Wince*, 66 F.4th at 1040. If the plaintiff meets this burden, the "burden shifts to the defendant to provide a legitimate justification, before finally shifting back to the plaintiff to establish that such justification was pretextual.'" *Id.* (quoting *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022)). "Pretext is a lie, specifically a phony reason for some action." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 403-404 (7th Cir. 2008) (internal quotation marks and citations omitted). Thus, "to show pretext, a plaintiff must show that (1) the employer's nondiscriminatory reason was dishonest, and (2) the employer's true reason was based on a discriminatory intent." *Id.* "Pretext does not exist 'if the decisionmaker honestly believed the nondiscriminatory reason' given by an employer for an adverse employment action." *Downing v. Abbott Laboratories*, 48 F.4th 793, 804 (7th Cir. 2022). "So, in evaluating pretext, the focus is on what the decisionmakers knew, and their perceptions are 'controlling.'" *Id.* at 804-805 (quoting *Stockwell v. City of Harvey*, 597 F.3d 895, 902 (7th Cir. 2010)).

As an alternative to the *McDonnell Douglas* framework, a plaintiff "may prove discrimination in a holistic fashion, by proffering 'direct or circumstantial evidence of intentional racial discrimination.'" *Wince*, 66 F.4th at 1040 (quoting *Bagwe v.*

*Sedgwick Claims Mgmt. Servs., Inc.*, 811 F.3d 866, 879 (7th Cir. 2016); see also *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) ("*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination."). Direct evidence is "what [the employer] said or did in the specific employment decision in question." *Rudin v. Lincoln Land Community College*, 420 F.3d 712, 720 (7th Cir. 2005); see also *Nichols v. Southern Illinois Univ.-Edwardsville*, 510 F.3d 772, 781 (7th Cir. 2007) (explaining that "[d]irect evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption"). Circumstantial evidence is "evidence which allows the trier of fact to *infer* intentional discrimination by the decisionmaker." *Rudin*, 420 F.3d at 720 (emphasis in *Rudin*).

In this case, Hannon argues that she has sufficient evidence to proceed to trial whether viewed through the lens of *McDonnell Douglas* or in a holistic fashion under *Ortiz*. [See Dkt. 165 at 8.] The Court begins with *McDonnell Douglas*.

### a. *McDonnell Douglas*

Defendants do not challenge that Hannon is a member of a protected class, that she was a good at her job and therefore meeting the City's legitimate job expectations, or that she suffered adverse employment actions when she was offered a full-time position at lower pay and then terminated when the City outsourced its finance department. Defendants argue, however, that Hannon cannot show that similarly situated employees outside her protected class were treated more favorably

because the male directors offered as Hannon's comparators were actually treated *less* favorably.

While the parties' briefs frame the issue as whether Hannon was treated better or worse than the male directors, their arguments simply highlight the larger problem with Hannon's claim: Hannon cannot show that she is sufficiently similar to the male directors to analyze this case under the framework of *McDonnell Douglas*. See *Crain v. McDonough*, 63 F.4th 585, 591-92 (7th Cir. 2023) (plaintiff has burden to establish *prima facie case* of employment discrimination). Although they need not be identical, "[s]imilarly situated employees must be directly comparable to the plaintiff in all material respects." *Formella v. Brennan*, 817 F.3d 503, 512 (7th Cir. 2016) (internal citation and quotation marks omitted); see also *Andy Mohr Truck Ctr. v. Volvo Trucks N. Am.*, 869 F.3d 598, 604 (7th Cir. 2017). "Relevant factors include 'whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *David*, 846 F.3d at 226 (internal citations and quotation marks omitted).

Hannon argues that the male directors were similarly situated to her because they "all had their own departments, all reported to Wade, and all were required to attend council meetings." [Dkt. 165 at 9.] This ignores the material fact that Hannon was a part-time, hourly employee, while all of the male directors were full-time salaried employees. Although neither side addresses the applicable precedent, the

25

Seventh Circuit has held that "full-time employees are simply not similarly situated to part-time employees." *Ilhardt v. Sara Lee Corp.*, 118 F.3d 1151, 1155 (7th Cir. 1997); see also *Fuqua v. Brennan*, 645 Fed. Appx. 519, 523 (7th Cir. 2016); *Brown v. Super K-Mart*, 1999 WL 417338, at *4 (N.D. Ill. June 16, 1999); *Hizer v. South Bend Tribune*, 2012 WL 639923, at *5 (N.D. Ind. Feb. 24, 2012) ("Although Plaintiff maintains that she is able to accomplish full-time work in part-time hours, she cites no authority for her proposition that part-time work, albeit by a very productive employee, is equivalent to a full-time performance. In fact, the Court of Appeals for the Seventh Circuit has noted the opposite." (citing *Ilhardt*)); *Fulmore v. Home Depot, U.S.A., Inc.*, 2006 WL 839460, at *17 (S.D. Ind. Mar. 30, 2006); *Foster v. Ivy Tech State College*, 1997 WL 907910, at *7 (S.D. Ind. Nov. 17, 1997) (Hamilton, J.) ("the Seventh Circuit has consistently held that a part-time worker is not similarly situated to a full-time worker" (citing *Ilhardt*, 118 F.3d at 1155; *Box v. A & P Tea Co.*, 770 F.2d 1372, 1379 (7th Cir. 1985)).

Here, a similarly situated male employee would be one who, like Hannon, was part-time and hourly, and who was not forced to switch to a full-time job or face termination. There is no evidence that such an employee exists. Hannon's real issue with the City is that it required her to work full-time (like the male directors) instead of on a part-time hourly basis (like she and the City originally agreed).

The problem with using the full-time male directors as comparators becomes more apparent when assessing Hannon's claim that the male directors were treated more favorably than her. She cannot meet her burden because there is no way to

"isolate the critical independent variable"—gender—by "eliminat[ing] other possible explanatory variables" for the employer's actions. *Formella*, 817 F.3d at 512. Hannon emphasizes that the proposed budget for 2017-2018 gave the full-time male directors 3% raises, while she received approximately a 20% pay cut as compared to the salary she collected during the prior fiscal year. From Hannon's perspective, this may be unfair, but she still cannot show that the male directors were treated *more* favorably since they were already subject to the same job conditions that Hannon considers to be dealbreakers: they work full-time in the office, for a set salary, and do not receive additional pay if they work over their budgeted hours. In Defendants' view, requiring Hannon to work full-time for $125,000 simply "normalized" her position with that of the male directors.

In the end, the goal of the *McDonnell Douglas* framework is to "eliminate other possible explanatory variables." *Formella*, 817 F.3d at 512. Given the possible variables for giving Hannon a pay cut and the male directors a pay raise, that framework simply cannot answer the question whether the City's adverse employment actions should be attributed to gender. Put another way, Hannon's status as a part-time, hourly employee "sets her apart from" the full-time male director-level employees. *Reehoff v. Bath & Body Works, LLC*, 2016 WL 1270428, at *5 (N.D. Ill. Mar. 30, 2016). The Court is therefore unable to infer that gender discrimination "rather than this distinction in employment status *caused* the differing employment decisions." See *id.* (at summary judgment stage in age discrimination case, plaintiffs, who were part-time employees, were not similarly

situated to full-time employees because "[t]here are simply too many differences –
such as number of hours worked, pay, and benefits – between part-time and full-time
employees to consider them comparable enough to the point where a fact-finder could
link any disparate treatment to discriminatory animus" (citing *Ilhardt*, 118 F.3d at
1155)); see also *Fuqua v. Brennan*, 645 Fed. Appx. 519, 523 (7th Cir. 2016) (affirming
grant of summary judgment for employer on ADEA claim where plaintiff "has not
explained how junior, part-time flexible mail handlers are similarly situated to him—
a senior, full-time mail handler"). For this reason, Hannon's Title VII claim falters
under a *McDonnell-Douglas* analysis.

### b. *Ortiz*

Because Hannon cannot rely on the inference of discrimination that arises
from evidence that similarly situated employees outside the protected class were
treated more favorably, she needs some other evidence linking the City's adverse
employment actions to discriminatory animus. Under *Ortiz*, the Court takes a holistic
approach to the evidence and asks simply "whether the evidence would permit a
reasonable factfinder to conclude that the plaintiff's [membership in a protected class]
... caused the discharge or other adverse employment action" at issue. 834 F.3d at
765; see also *Lewis*, 36 F.4th at 760 (the court assesses the evidence as a whole, rather
than asking whether any particular piece of evidence proves the case by itself).

The parties' treatment under *Ortiz* is cursory and primarily focused on
*McDonnell Douglas*. In their opening brief, Defendants assert that "Hannon relies on
ambiguous statements by others or speculative statements by Mayor Helmer that do

28

not support the conclusion that Hannon's gender played any role in the City's decision, especially where all of the male directors were full-time salaried." [Dkt. 161 at 16.] But Defendants do not identify the relevant statements or explain why they are too ambiguous or speculative to support an inference that the termination was because of gender.

There are "three broad types of circumstantial evidence that will support an inference of intentional discrimination: ambiguous or suggestive comments or conduct; better treatment of people similarly situated but for the protected characteristic; and dishonest employer justifications for disparate treatment." *Joll*, 953 F.3d at 929. If, taken together, this "evidence would permit a reasonable jury to infer an overall likelihood of discrimination," summary judgment must be denied. *Id*. Hannon's brief offers a variety of circumstantial evidence of causation which, viewed as a whole and in the light most favorable to her, is sufficient to permit a reasonable jury to infer "an overall likelihood of discrimination." *Ortiz*, 834 F.3d at 763.

Hannon's evidence of discriminatory animus focuses primarily on Alderman Williamson and City administrator Wade. Williamson is accused of making several statements suggesting gender-based animus. The first statement was allegedly made to Marrin, the female administrator who hired Hannon. "[B]ehavior toward or comments directed at other employees in the protected group' is one type of circumstantial evidence that can support an inference of discrimination." *Vega v. Chicago Park District*, 954 F.3d 996, 1005 (7th Cir. 2020) (quoting *Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 529 (7th Cir. 2008)); see also *Henderson v. Shulkin*, 720

Fed. Appx. 776, 784 (7th Cir. 2017). And "[a] remark or action by a decision-maker reflecting unlawful animus may be evidence of his or her attitudes more generally." *Joll*, 953 F.3d at 935.

Marrin was asked at her deposition whether Williamson ever said anything during her tenure at the City that she "believed to be discriminatory towards women." [Dkt. 166-6 at 15 (Tr. 60:21-23).] Marrin responded that after she announced she was leaving for Fox Lake, Williamson "came in and he said, 'we're going to hire a man and we're going to pay him more than you.'" [*Id.* at 15-16 (Tr. 60:24-61:3).] Marrin acknowledged that Williamson "is kind of a jokester," and that in the end, [he] had written me a very nice email … So I think he tried to make amends for that." [*Id.* at 16 (Tr. 61:6-16).] Williamson does not deny he made the statement to Marrin (though he does not recall it), and claims that if he did, he would have been joking. [See Dkt. 166-4 at 4 (Tr. 12:2-9).] But even as a joke, the statement suggests that Williamson takes gender to be a salient characteristic in determining employee pay.

Hannon's testimony, as well as the investigator's report, suggest the same. It is undisputed that Williamson admitted telling people other than Hannon that he "wished his wife made as much as Hannon did," although he could not recall who and he denied making the statement to Hannon. [Dkt. 167, ¶ 22.] Williamson also told the investigator the same thing—that he "wished his wife made as much as Hannon did." *Id.* Williamson's references to gender and pay is arguably consistent with Mayor Helmer's purported statement to Hannon that "the questions regarding her pay or salary were related to her gender and that a woman was making too much money."

[*Id*, ¶ 73.] Although "isolated comments that are no more than 'stray remarks' in the workplace are insufficient to establish that a particular decision was motivated by discriminatory animus," *Petts v. Rockledge Furniture LLC*, 534 F.3d 715, 721 (7th Cir. 2008), where "the remark comes from the decisionmaker and was made during the decisionmaking process," it may be "probative evidence of unlawful discrimination." *Belcastro v. United Airlines, Inc.*, 2022 WL 899954, at *7 (N.D. Ill. Mar. 28, 2022); see also *Joll*, 953 F.3d at 934 ("[t]he 'stray remarks' rationale can be applied only to remarks that are not part of the decision-making process itself"). Williamson was intimately involved in the decision to make Hannon's position full-time. At the first executive session in July 2016, Williamson introduced the topic of her compensation and repeatedly referred to the fact that she was also working at Fox Lake, even though this was an approved-of arrangement.

Apart from Williamson's comments linking gender and compensation, there is also more general evidence of gender-based animus by Williamson and Wade. According to Hannon, in the fall of 2015, at Williamson's direction, Wade relayed to Hannon that Hannon "did not know my place in a City Council meeting, and that I should be quiet." [Dkt. 157-5 at 62 (Tr. 247:20-24).] Hannon testified that this made her feel "as a woman that I did not have a voice, and that I was supposed to be quiet during meetings," which she viewed as gender discrimination. [*Id*. (Tr. 247:24-248:3).] Defendants do not deny that this conversation occurred but characterize the issue as one of Hannon improperly interjecting her opinion during discussions between council members. [Dkt. 167, ¶ 26.] The evidence is certainly open to interpretation,

and a reasonable jury might conclude Hannon "was being penalized for transgressing the age-old stereotype that women are or ought to be submissive." *Joll*, 953 F.3d at 931-32. After all, Defendants point to nothing in the record suggesting that staff members were not allowed to talk or have opinions during council meetings.

Wade testified that he "shared Alderman Williamson's concern" about Hannon talking during council meetings and claimed that "there were times [Hannon] sometimes became more of a council member than a staff member." [Dkt. 144-12 at 35 (Tr. 137:1-9).] Wade is the one who allegedly delivered the message to Hannon that she needed to "be quiet." [Dkt. 165 at 14.] And Hannon says that her after she complained about Zimmerman's bills, Wade told Hannon that City Council was going to discuss her compensation at the next meeting [Dkt. 166. ¶ 39.]

There is also some evidence that Wade and Williamson offered pretextual justifications in support of changing the finance director position to a full-time, salaried, in-person job. "[A]n employer's dishonest explanation of a decision can support an inference that its real reason was unlawful." *Joll*, 953 F.3d at 932. "'[I]f the jury does 'not believe the employer's explanation for its decisions, it may infer that the employer is trying to cover up ... discrimination.'" *Id.* (quoting *Gehring v. Case Corp.*, 43 F.3d 340, 343 (7th Cir. 1994)).

As noted above, Defendants do not challenge that Hannon was a good at her job and meeting legitimate job expectations, nor is there any real dispute that Hannon's hours and her hourly rate were all approved. The strongest and most obvious justification for changing Hannon's job to full-time salaried was that she had

been billing substantially over 1,500 hours for several years, which created budgeting uncertainty and arguably showed that the director job really was a full-time role. But Hannon has come forward with evidence that this justification was pretextual, in particular, that no one gave any serious consideration as to why the role had been exceeding 1,500 hours per year or whether it would be possible or desirable to cap the hours to avoid the problem going forward.

For example, Hannon explains that the finance director role was established as part-time, and should have remained part-time, because her hours fluctuated depending on the time of the year. In particular, more hours were required during budgeting season and certain reporting periods, but other times were less hectic and required less than 20 hours a week of her attention. [Dkt. 166-14, ¶ 7.] This difference in workflow arguably distinguishes Hannon from the other (all male) director-level employees (like Wade and the police chief) and makes "normalizing" the finance director position with her male peers inappropriate. Hannon says that she exceeded 1,500 hours per year for several years because the City gave her additional work to fill in for other vacant positions, such as in 2014 and 2015 when interim City administrators worked less than full-time. [See Dkt. 166, ¶ 24; Dkt. 166-55 at 9.] In another example, at least one participant in the July executive session noted that Hannon had been handling traffic ticket appeals, yet there was no discussion of why Hannon had been assigned this non-finance role. [Dkt. No. 148 at 72 (Tr. 34:22-36:2).]

The evidence supporting Defendants' other justifications for making the position full-time salaried are disputed as well. There is little evidence that anyone

33

had trouble reaching Plaintiff when they needed or wanted her, other than alderman Ludvigsen's statement that he preferred to talk to employees in person rather than over the phone or email. And though Defendants emphasized the need for the finance director to be available during regular office hours, the L&A employee who took over as finance director, DuCharme, was part-time and came into the office two days a week. Defendants emphasize that L&A provided a full staff and that someone was usually in the office during business hours, but Trausch worked full-time, too. If the full finance department is the proper comparator, then Hannon plus Trausch provided essentially the same coverage as L&A. Cf. *Joll*, 953 F.3d at 933 ("inconsistent explanations, especially from the same decision-makers about similar decisions near the same time, can support an inference of unlawful intent").

Hannon points to one more allegedly pretextual reason that Wade gave for making the finance director job full-time and cutting her pay: that the finance director position was being changed to full-time due to budgetary reasons. Defendants deny that this is the explanation Wade provided, but the transcript of the July executive session reveals that Wade introduced the topic of Hannon's compensation to the council by saying "[w]e've been looking for ways to save money." [Dkt. 148 at 64 (Tr. 3:14-18).] Hannon's testimony and the council meeting minutes both indicate that Wade and the City justified their decision based on budgetary need. Despite this, the record shows that Hannon's salary was the only line item in the budget being cut—a point that Mayor Helmer also allegedly made to Hannon following the executive session. [See Dkt. 167, ¶ 87.] And it is disputed whether (and

34

whether Wade actually believed) that hiring L&A would be cheaper than hiring a new finance director and an assistant finance director.

Viewing the record in the light most favorable to Hannon, a reasonable factfinder could conclude that Williamson and Wade were motivated at least in part by gender animus when they worked to convert the finance director role into a full-time, salaried position and then outsource the City's finance department. From Hannon's perspective, she was hired for a part-time hourly job, she did excellent work and filled in where needed, and her hours, pay, and arrangement at Fox Lake were all approved. There is at least some evidence that Williamson and Wade believed that Hannon overstepped her position as finance director, and Williamson purportedly made remarks linking gender to compensation. After Hannon questioned Zimmerman's bills, Williamson and Wade pursued transitioning Hannon's position to a full-time salaried employee. Wade offered Hannon a full-time position at $125,000 per year, which would appear to bring her compensation substantially below the 2017-2018 salaries for City administrator (Wade's role) and the Police Chief. [Dkt. 167, ¶ 89.] It also eliminated her ability to work at Fox Lake. On this record, the decision as to whether there was gender animus belongs to a jury.

Defendants emphasize that the specific adverse employment actions that Hannon challenges—offering her a full-time job at a reduced hourly rate and then outsourcing the City's finance department—were authorized by the whole council, which consists of five members. Williamson was just one member, and Wade did not have a vote. [See Dkt. 161 at 17.] It is true that Hannon offers no specific argument

35

that any of the other council members were motivated by animus. But this is not necessarily fatal for at least two reasons. First, although Wade did not have an official vote on council decisions, the council invested Wade with significant discretion over how to present the job offer. [Dkt. 148 (Tr. 44:1-7.)] The City also deferred to his advice on a reasonable salary to offer and the relative benefits of outsourcing the finance department to L&A. [*Id.*]

Second, Hannon makes clear that she intends at trial to rely at least in part on a "cat's paw" theory of liability. Under Seventh Circuit precedent, "where an employee without formal authority to materially alter the terms and conditions of a plaintiff's employment nonetheless uses her 'singular influence' over an employee who does have such power to harm the plaintiff for [gender-based] reasons, the actions of the employee without formal authority are imputed to the employer and the employer is in violation of Title VII." *Brewer v. Board of Trustees of University of Illinois*, 479 F.3d 908, 917 (7th Cir. 2007). The cat's paw theory of liability does not apply where the decisionmaker does not rely on the conclusions of an allegedly biased employee, but instead decides bases her decision on facts presented by an unbiased party. *Woods v. City of Berwyn*, 803 F.3d 865, 870-71 (7th Cir. 2015).

Hannon contends that "[t]he City is liable as Hannon's employer and Wade and Williamson used the council as a 'cat's paw' doing to do their bidding, by influencing consensus and convincing them to force Hannon out under the pretext of a bona fide job offer they knew would be rejected." [Dkt. 165 at 14.] She also argues that City Council's decision to retain Arnoff to prepare an investigative report "does not

36

immunize the City from cat's paw liability." [*Id.* (citing *Grant v. Trs. of Indiana Univ.*, 870 F.3d 562, 570 (7th Cir. 2017); *Staub v. Proctor Hosp.*, 562 U.S. 411 (2011).]

Defendants' only response to this is that the July executive session and the Declarations from the individual alderpersons "clearly do not support th[e] claim" that Wade and Williamson used the council as a "cat's paw." [Dkt. 168 at 8.] According to Defendants, "the facts are clear that the council had made up its mind to change the Finance Director position back in July 2016." [*Id.*] And Defendants do not attempt to rely on Arnoff's report as an independent basis for the council's decision. [See *id.* ("any criticisms that Hannon has to Arnoff's investigation are neither material nor relevant to this motion").]

Based on these arguments, the record, and the case law, the Court concludes that the Title VII gender discrimination claim must go to a jury. A reasonable jury could conclude that Williamson and Wade held discriminatory animus, which they used to influence the council to agree to change the finance director position to full-time, knowing that this would cause Hannon to quit. A reasonable jury could further conclude that the council would not have taken the same actions but-for Williamson and Wade's influence. There is little evidence that when they arrived for the executive session, any of the aldermen other than Williamson (who allegedly harbored discriminatory animus) and potentially Ludvigsen had a position on whether the job should be part-time or full-time. Alderman Messer stated in her declaration that she reached this determination at the session, and notes that Wade was tasked with researching and presenting market rates for a full-time finance director. [Dkt. 144-

15, ¶¶ 10, 12.] Alderman Dolick was in favor of offering a full-time position because it was his "understanding from others"—who are unspecified—that Hannon "was rarely at the City because she also worked somewhere else and Alderpersons would leave messages for her that would not be returned for a few days later." [Dkt. 144-16, ¶ 6.] There is nothing in the record to suggest that Dolick made this assessment before the meeting or based on any independent knowledge. Alderman Rosenthal had an "understanding" that Hannon was a part-time hourly employee but was working full-time hours. [Dkt. 144-18, ¶ 4.] He does not explain when or how he developed this understanding. Only Alderman Ludvigsen states in his declaration that, by sometime in 2016, he "believed that it made no sense to continue having a part-time hourly employee in a position that clearly needed to be full-time." [Dkt. 144-17, ¶ 16.]

Read in the light most favorable to Hannon, the transcript arguably supports her position that Williamson and Wade influenced consensus and convinced the council to force her out under the pretext of a full-time job offer that they knew would be rejected. Williamson began the meeting by stating that, "[w]e've been looking for ways to save money." [Dkt. 148 at 64 (Tr. 3:14-18).] And there is at least some evidence that this was a pretextual reason for changing the position to full-time, given that the other directors all received a 3% raise and Hannon's salary was the only line item in the budget that was under consideration. Williamson then discussed the details of how Hannon's billed hours had exceeded her budgeted hours for several years, but did not discuss why—which according to Hannon was because she had been required to take on additional work to cover vacant positions. Williamson also

brought up the fact that Hannon was working at Fox Lake and opined that working both jobs "doesn't equate to something that's sustainable over time," (*Id.* (Tr. 4:17-18), even though Hannon had managed to work both jobs for several years; there is no dispute that Hannon was doing a good job; and there is little evidence that Hannon's part-time schedule made her unavailable when needed. Defendants now claim that Fox Lake "wasn't the issue," [Dkt. 166, ¶ 88], but the transcript undermines this.

During the session, questions were raised about whether the finance director should be a full-time or part-time position. Williamson weighed in that "we should have her full-time" because "it's obviously not a 30 hour a week position," and directed the discussion away from what jobs the finance director should actually be performing. [Dkt. 148 at 67 (Tr. 15:10-17).] Zimmerman weighed in that the position should be full-time, emphasizing the amount of money Hannon made working for Fox Lake and questioning whether she was working at "peak efficiency" for the City. [*Id.* at 70 (Tr. 28:21-22).] Both the Mayor and City Clerk Adams predicted that Hannon would quit if she was required to work full-time and not allowed to work at Fox Lake and questioned the wisdom of that decision. [*Id.* at 74 (Tr. 42:22-43:3).] Yet by the end of the meeting the council agreed that Wade would be tasked with proposing a full-time salaried position and with gathering data on comparable salaries. And after Trausch quit, Wade recommended outsourcing the finance function and provided an analysis to the Board indicating that it would result in a cost-savings—a conclusion that is disputed.

Given this record, the fact that the entire council approved a full-time salaried position at $125,000 and then approved the choice of L&A does not insulate the City from potential Title VII liability. If a jury concludes that Wade and Williamson had discriminatory animus and used their influence to convince the council that the finance director position needed to be full-time, knowing that this was not true and it would cause Hannon to quit, then the City could be liable under Title VII. For these reasons, the Court denies summary judgment to the City on Plaintiff's Title VII gender discrimination claim.

### 2. Section 1983 Equal Protection

Defendants' motion for summary judgment on the § 1983 equal protection claim rests primarily on the same arguments that Defendants make concerning the Title VII claim. For the reasons explained in the preceding section, the Court rejects Defendants' argument that Wade and Williamson are entitled to summary judgment due to a lack of evidence that they acted with discriminatory intent. [See Dkt. 161 at 16-17.]

Defendants also argue that Wade is entitled to summary judgment on the § 1983 equal protection claim brought against him in his personal capacity because Wade "did not have final policymaking authority as to the changes made to Hannon's position." [*Id.* 17.] Wade's argument, however, is based on an inapplicable legal standard. The case on which Defendants rely, *Milestone v. City of Monroe, Wis.*, 665 F.3d 774 (7th Cir. 2011), explains that to impose "*municipal* liability under § 1983, the constitutional violation must be caused by (1) an express municipal policy; (2) a

40

widespread, though unwritten, custom or practice; or (3) a decision by a municipal agent with 'final policymaking authority.'" *Milestone*, 665 F.3d at 780 (emphasis added) (quoting *Darchak v. City of Chi. Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009); citing *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 694 (1978)). To advance a § 1983 equal protection claim against a municipal *employee* in his individual capacity, a plaintiff must prove that the employee "caused or participated" in the allegedly constitutional deprivation in some way. *Kuhn v. Goodlow*, 678 F.3d 552, 556 (7th Cir. 2012); see also *Rasho v. Elyea*, 856 F.3d 469, 478 (7th Cir. 2017) ("While the defendant need not have participated directly in the deprivation of the plaintiff's constitutional right to be held liable, he or she must nonetheless have 'know[n] about the conduct, facilitate[d] it, approve[d] it, condone[d] it, or turne[d] a blind eye for fear of what they might see.'" (quoting *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012))). The Seventh Circuit has also recognized that "a cat's paw theory would support imposing individual liability under § 1983 on subordinate government employees who act with unlawful motives to cause the actual decision-makers to take action against another employee." *Taylor v. Ways*, 999 F.3d 478, 488-89 (7th Cir. 2021) (citing *Smith v. Bray*, 681 F.3d 888, 898 (7th Cir. 2012), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 764–66 (7th Cir. 2016)).

As the Court's analysis of the Title VII claim indicates, Hannon has sufficient evidence of Wade's participation in and influence over the City's adverse employment actions to survive summary judgment on the § 1983 equal protection claim. There is

41

evidence both that Wade participated in the decision to make Hannon's position full-time and influenced the council's decision to approve the change. See, e.g., *Taylor*, 999 F.3d at 487-89 (genuine issues of material fact existed as to whether senior investigator of office of professional review for sheriff's office had racial animus against employee-officer whom he investigated, whether the investigation and investigator's report of employee-officer's misconduct was influenced by his racial animus, and whether the investigation and report resulted in employee-officer's race-motivated discharge, precluding summary judgment in favor of investigator on § 1983 equal protection claim based on cat's paw theory that official who made ultimate decision to terminate employee-officer's employment based that decision on the investigator's animus); *Sizyuk v. Purdue University*, 2023 WL 2016823, at *22 (N.D. Ind. Feb. 15, 2023) (evidence that senior faculty member on tenure committee of public university's nuclear engineering department, an Asian male, had made derogatory statements about women and non-Asians, and that he influenced committee to vote against female professor's tenure application, was sufficient to create genuine issue of material fact as to whether his vote against professor was based on her gender or race, precluding summary judgment on professor's § 1983 claim against faculty member alleging equal protection violation).

For these reasons, Defendants' motion for summary judgment on the § 1983 equal protection claim is denied.

42

**B.    Retaliation Based On Complaints About Gender Discrimination**

Hannon also brings retaliation claims against all three Defendants pursuant to § 1983 and the Equal Protection Clause (Count III) and against the City only under Title VII (Count IV) and the Illinois Human Rights Act ("IHRA") (Count V). The Court finds it unnecessary to assess the merits of the § 1983 equal protection retaliation claim, however, because it is not a recognized cause of action.

In *Boyd v. Illinois State Police*, the Seventh Circuit held that "the right to be free from retaliation may be vindicated under the First Amendment or Title VII, but not the equal protection clause," "even if protected activity such as complaining of sex discrimination prompted the retaliation." 384 F.3d 888, 898 (7th Cir. 2004); see also *Hallmon v. Sch. Dist. 89*, 911 F. Supp. 2d 690, 706–07 (N.D. Ill. 2012) ("Although § 1983 allows for suits for [class] discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment, the Equal Protection Clause does not prohibit state actors from retaliating against persons who complain of equal protection violations—that is, it does not contain an anti-retaliation provision analogous to that of Title VII."); *Rosas v. Board of Education of City of Chicago*, 2023 WL 415183, at *7 (N.D. Ill. Jan. 25, 2023); *Sailsbery v. Village of Sauk Village*, 2016 WL 4701446, at *7 (N.D. Ill. Sept. 8, 2016).

That leaves Counts IV and V. In Count IV, for Title VII retaliation, Hannon alleges that after she complained about discrimination to the IDHR and the EEOC, Defendants reduced her wages, increased her hours and eliminated her ability to earn

43

additional income from another part time job. [Dkt. 33, ¶ 160.] Count V, for violation of the IHRA, is based on the same allegedly retaliatory actions. [See *id.*, ¶¶ 174-75.]

"To succeed on a Title VII retaliation claim, a plaintiff must "present evidence of (1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two." *Volling v. Kurtz Paramedic Servs., Inc.*, 840 F.3d 378, 383 (7th Cir. 2016) (quoting *Turner v. The Saloon, Ltd.*, 595 F.3d 679, 687 (7th Cir. 2010)). "Illinois courts apply the federal Title VII framework to IHRA claims." *Id.*

Defendants argue that they are entitled to summary judgment on both the Title VII and IHRA claims. They argue that Hannon cannot show a causal link between her protected activity—her August 2016 internal complaint of gender discrimination and her January 19, 2017 IDHR charge—because "City officials questioned Hannon's hours and compensation for years prior to moving forward with the elimination of her part-time position and the July 25, 2016 executive session transcripts make[] clear that the council was moving forward on its plan before Hannon ever brought forward her concerns of gender discrimination." [Dkt. 161 at 18.] Hannon responds that she first reported unlawful discrimination "before the City began questioning her hours" by "complain[ing] to the Mayor just a day or two before the July 2016 Executive Session." [Dkt. 165 at 15.] In their reply brief, Defendants dispute that Hannon's conversation with Mayor Helmer occurred before the executive session, but argue that it does not matter anyway because "there are no facts in the record that any member of the city council was aware of this discussion at the time

that they met on July 25, 2016 and that was certainly never raised by anyone during the executive session." [Dkt. 168 at 7.]

The Court agrees that there is no evidence that the council knew about Hannon's complaint of gender discrimination when they convened for executive session on July 25, 2016. By the end of that session, the aldermen had come to an agreement (although without a formal vote) that the finance director should be a full-time salaried position and that Wade was to gather data on salaries paid to full-time finance directors in comparable communities.

This leaves the issue of the City's formal offer of the full-time finance director position at $125,000, made on March 1, 2017. [Dkt. 166, ¶ 87; Dkt. 167, ¶ 88.] That was a little over a month after Hannon filed her charge of discrimination with the IDHR on January 19, 2017 [see Dkt. 33-1 at 1], and shortly after Arnoff issued her report of investigation on January 25, 2017. [Dkt. 148 at 21-62.] There is no doubt that Wade and Messer knew about the IDHR charge when they made the offer to Hannon. [Dkt. 166, ¶ 87; Dkt. 167, ¶ 88.] But there also is no evidence in the record suggesting that the formal offer Wade made in March 2017 was less favorable to Hannon than the offer she would have received had she not complained about gender discrimination. Rather, the record shows that once the council became aware of Plaintiff's claim of gender discrimination, it halted its final decision on how to proceed with the position and hired Arnoff to investigate. Several weeks later after Arnoff issued her report, Wade proceeded with the City's formal offer of the full-time finance director position at $125,000.

On this record, Hannon cannot meet her burden of showing the required causal connection between her protected activity and the City's actions. See *Jokich v. Rush University Medical Center*, 42 F.4th 626, 635 (7th Cir. 2022) The timeline above forecloses any possibility that the City offered Hannon the full-time position and subsequently terminated her *because* she filed complaints of discrimination. Rather, the "paper trail" establishes that Defendants were well on the way to converting the finance director position to a full-time role as of at least July 25, 2016, a process that was paused during the Arnoff investigation. [Dkt. 146 at 63.] Given this progression, Hannon simply cannot show that she would not have received the offer she did in March 2017 absent her gender discrimination complaint. *Jokich*, 42 F.4th at 635 (plaintiff doctor could not establish causal link between his protected activity of filing a complaint for discrimination and the defendant hospital's decision to terminate him, where a "paper trail" confirmed the hospital's account that plaintiff's "termination was halted ... in response to [plaintiff's] complaint of discrimination, which came shortly after the draft termination letter had been completed"); *Khungar v. Access Community Health Network*, 985 F.3d 565, 578-79 (7th Cir. 2021) (employee failed to show causal connection between her three complaints of discrimination and subsequent termination where first two complaints were insufficiently close to termination to support an inference of pretext and third complaint occurred after defendant employer had already made decision to terminate her and plaintiff had received 90-day notice of termination). Defendants are therefore entitled to summary judgment on the Title VII and IHRA retaliation claims.

46

### C.    First Amendment Retaliation

In her First Amendment retaliation claim (Count VI), Hannon alleges that she exercised her right to freedom of association by "publicly supporting Helmer and associating herself with Mayor Helmer," who is alleged to be a political opponent of Williamson. [Dkt. 33, ¶¶ 188, 191.] Defendants argue that they are entitled to summary judgment on the First Amendment retaliation claim because Hannon can't prove that the council members considered her to be a political supporter of the mayor; Defendants had a non-political reason for changing Hannon's position to full-time and then terminating her employment; and Hannon "cannot show a political motive given that the July 25, 2016 executive session transcript shows that even the mayor agreed with the decision to change the finance director position to full-time." [Dkt. 161 at 21.]

"To make out a *prima facie* case of First Amendment retaliation, a plaintiff must 'show that: (1) he engaged in constitutionally protected speech; (2) he suffered a deprivation likely to deter him from exercising his First Amendment rights; and (3) his speech was a motivating factor in his employer's adverse action against him.'" *Int'l Ass'n of Fire Fighters, Local 365 v. City of East Chicago*, 56 F.4th 437, 446 (7th Cir. 2022) (quoting *Cage v. Harper*, 42 F.4th 734, 741 (7th Cir. 2022)). If the plaintiff makes that showing, "the burden shifts to the government employer to produce evidence that it would have [taken the disputed action] even in the absence of the protected speech." *Kingman v. Frederickson*, 40 F.4th 597, 601 (7th Cir. 2022). "If the

47

employer carries that burden, a plaintiff must persuade the factfinder that the defendant's proffered reasons were pretextual." *Id*. at 602.

The parties skip over this step, but the Court "begin[s] with a 'threshold inquiry into the nature of the speech at issue' to determine whether the speech is constitutionally protected." *Cage*, 42 F.4th at 741-42 (quoting *Kennedy v. Bremerton Sch. Dist.*, -- U.S. --, 142 S. Ct. 2407, 2423 (2022)). "This question comes first because the Free Speech Clause only 'protects a public employee's right to speak as a citizen addressing matters of public concern under certain circumstances.'" *Id*. (quoting *Vose v. Kliment*, 506 F.3d 565, 569 (7th Cir. 2007)). "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).

"Determining the official duties of a public employee requires a practical inquiry into what duties the employee is expected to perform and is not limited to the formal job description." *Id*. (citing *Houskins,* 549 F.3d at 490); *see also Garcetti,* 547 U.S. at 424–25 (observing that "[f]ormal job descriptions often bear little resemblance to the duties an employee actually is expected to perform"). "Public concern" means "legitimate news interest," or "a subject of general interest and of value and concern to the public at the time of publication." *Meade v. Moraine Valley Cmty. Coll.,* 770 F.3d 680, 684 (7th Cir. 2014) (cleaned up) (quoting *City of San Diego v. Roe,* 543 U.S. 77, 83–84 (2004) (per curiam)). "Whether an employee's speech addresses a matter of

public concern must be determined by the content, form, and context of a given statement." *Connick v. Myers,* 461 U.S. 138, 147–48 (1983). In this analysis, "content is the most important" and "[t]he motive of the speech is relevant as part of the context . . . but is not dispositive." *Kubiak*, 810 F.3d at 483.

Neither party clearly identify the "constitutionally protected" speech in which Hannon engaged. Hannon simply argues in response to summary judgment that the aldermen considered her a supporter of Mayor Helmer for three reasons. First, she emphasizes that shortly before the July 25, 2016 executive session, Williamson "accus[ed] her of making a biased presentation regarding the Arena land sale and aligning herself with the Mayor." [Dkt. 165 at 18.] Second, she identifies "the Zimmerman fraudulent billing issue." [*Id.*] But there is no evidence in the record that Hannon made either of these statements as a private citizen rather than as part of her job duties as finance director. While the Arena project was itself an issue that could be characterized as politically contentious, Hannon never claims that she prepared the financial analysis as a private citizen speaking on a matter of public concern. She made a presentation concerning the Arena property to the city council as part of her job as the City's finance director. She never claims that she reported Zimmerman's bills to the Mayor and Wade as a citizen. Rather, as part of her job as finance director, she routinely reviewed bills to the City and coded them, and also questioned invoices and bills from outside vendors from time to time if she saw something she thought was wrong. [Dkt. 166, ¶ 58.] *Garcetti*, 547 U.S. at 421; see also *Cage*, 42 F.4th at 742 (First Amendment did not protect plaintiff against retaliation

for reporting to university officials his belief that their appointment of a university board member as interim university president would constitute a potential conflict of interest because it was part of plaintiff's job duties as general counsel to provide advice on issues that could lead to litigation, including avoiding appearance of conflicts of interest). Therefore, Hannon cannot show that the First Amendment "insulates th[ese] communications from employer discipline." *Garcetti*, 547 at 421.[5]

The third category of speech on which Hannon bases her First Amendment retaliation claim is her "political work on the Mayor's campaigns." [Dkt. 165 at 18.] "With a few exceptions, the Constitution prohibits a government employer from discharging or demoting an employee because the employee supports a particular political candidate." *Heffernan v. City of Paterson, N.J.*, 578 U.S. 266, 270 (2016) (city police officer's superiors suspected him of supporting a rival candidate for mayor after plaintiff picked up a campaign sign of the rival for his mother). But the problem here is that there is nothing in the record suggesting that Hannon's support for the Mayor's campaign—rather than her statements made in her official job duties as finance director—was a "motivating factor in h[er] employer's adverse action against h[er].'" *Int'l Ass'n of Fire Fighters, Local 365*, 56 F.4th at 446. Hannon testified that she supported the Mayor politically by attending rallies, campaign parties and assisting with signs and political strategy. But there is no evidence that anyone was

---

[5]     *Garcetti* recognizes that there is a "powerful network of legislative enactments—such as whistle-blower protection laws and labor codes—available to those who seek to expose wrongdoing" without resorting to the First Amendment. 547 U.S. at 425. Hannon has resorted to such protections here, bringing whistleblower and common law retaliation claims against the City based the same Zimmerman "fraudulent billing" issue.

aware of these efforts in support of the Mayor—including the Mayor himself. [See Dkt. 167, ¶¶ 6-9.] See *Zerante v. DeLuca,* 555 F.3d 582, 585 (7th Cir. 2009) (finding that the plaintiff's claim that she was retaliated against for her political affiliations cannot proceed absent some evidence that [the decisionmakers] were aware of those affiliations); *McGreal v. Village of Orland Park,* 850 F.3d 308, 313 (7th Cir. 2017) ("Allegedly protected speech cannot be proven to motivate retaliation, if there is no evidence that the defendants knew of the protected speech.").

Lastly, any work that Hannon did for the 2015 campaign was too far attenuated in time from the events beginning in the summer 2016 to reasonably support an inference of retaliation. See, e.g., *Schmoeller v. Village of Island Lake*, 324 F. Supp. 3d 983, 992 (N.D. Ill. 2018) ("Suspicious timing on its own is rarely enough to raise an inference of causation, and when it does, the Seventh Circuit 'typically allow[s] no more than a few days to elapse between the protected activity and the adverse action.'" (quoting *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012))). Defendants' motion for summary judgment on the § 1983 First Amendment retaliation claim is granted.

### D. Retaliation Claims Based on Attorney Bills

#### 1. Illinois Whistleblower Act

In Count VII, Hannon alleges that the City violated the Illinois Whistleblower Act ("IWA") by terminating her in retaliation for complaining about Zimmerman's improper invoices to Wade, Helmer, and the City Council. [See Dkt. 33, ¶¶ 206-207, 210-11.] Under the Illinois Whistleblower Act, "[a]n employer may not retaliate

51

against an employee for disclosing information to a government or law enforcement agency, where the employee has reasonable cause to believe that the information discloses a violation of a State or federal law, rule, or regulation." 740 ILCS § 174/15(b). "Generally, reasonableness is a question of fact rather than a question of law, unless reasonable minds could not differ." *Brame v. City of North Chicago*, 955 N.E.2d 1269, 1273 (Ill. App. 2011) (citing *Gerwin v. Livingston County Board,* 802 N.E.2d 410, 418 (2003)).

Defendants do not dispute that since the City is a governmental body, Hannon's reporting to the mayor, Wade, and council qualifies as "disclosing information to a government … agency." [See Dkt. 168 at 9.] See also *Harris v. City of Chicago*, 479 F. Supp. 3d 743, 752 (N.D. Ill. 2020) ("The Illinois Whistleblower Act 'requires an employee only to report to a government or law-enforcement agency, and no exceptions apply if a government or law-enforcement agency is also the employer.'" (quoting *Brame*, 955 N.E.2d at 1272-73). Defendants argue that Hannon's IWA claim nonetheless fails because she "cannot present evidence that pointing out a billing error in the Tressler invoice related to a violation of a State or federal law, rule, or regulation and it was objectively unreasonable for Hannon to believe that she was disclosing evidence of any crime." [Dkt. 161 at 21-22.] Defendants maintain that the Tressler firm service agreement did not prohibit billing for a second attorney to attend council meetings, that the attorney in question was actually at the meeting, and that Zimmerman simply forgot to "strike" the attorney's time from the bill before sending it to the City, as was his practice. Hannon does not identify a particular law

that she believed was violated but maintains that "[t]heft is a crime and overbilling is stealing. It is fraud," and that she "was not the only person who thought Zimmerman's billing was fraudulent, the Mayor did too." [Dkt. 165 at 20-21.]

Though thin, the IWA claim cannot be decided on summary judgment. Although Hannon might have made out a stronger case, the Court cannot say based on this record that it was objectively unreasonable for her to believe that she was disclosing evidence of a State or federal law, rule, or regulation when she reported Zimmerman's overbilling in June 2016. Hannon does not cite the criminal code, but Defendants also have not shown that is required. For purposes of the IWA claim, "what matters is whether a plaintiff's belief that the law had been violated was reasonable, not whether it was correct." *Coffey v. DSW Shoe Warehouse, Inc.*, 145 F. Supp. 3d 771, 778 (N.D. Ill. 2015) (citing *Stebbings v. University of Chicago*, 726 N.E.2d 1136, 1144 (Ill. App. 2000)); see also *Harris v. City of Chicago*, 479 F. Supp. 3d 743, 752 (N.D. Ill. 2020) (plaintiff police officer stated IWA claim against his employer, the city, based on allegations CPD retaliated against him for disclosing to news media that City was discriminating against officers who sought help from the City's employee assistance program in violation of unspecified state and/or federal laws). Illinois' theft statute is broad, providing that "[a] person commits theft when he or she knowingly … [o]btains or exerts unauthorized control over property of the owner." 720 ILCS 5/16-1(a)(2). "A person commits the offense of attempt when, with intent to commit a specific offense, he or she does any act that constitutes a substantial step toward the commission of that offense." 720 ILCS § 5/8-4(a).

The record contains at least some support for Hannon's position that Tressler's bills for a second attorney to attend council meetings were unauthorized. Defendants point to the language in the contract with the Tressler firm that does not prohibit billing for a second attorney to attend council meetings. In response, Hannon relies on evidence that: (a) the contract gave the Mayor authority over that decision [Dkt. 144-20 at 12]; (b) the Mayor and Zimmerman had a verbal agreement that the firm would not charge for a second attorney to be present at city council meetings [Dkt. 166, ¶ 67]; and (c) the Mayor believed the Tressler firm was billing the City too much for its services, called the bills "fraudulent," and suggested a referral to the ARDC given systems designed to catch such errors. [Dkt. 166, ¶¶ 68-69; Dkt. 166-19; Dkt. 167, ¶ 35]. Defendants argue that Hannon cannot rely on the Mayor's opinion on fraud because his belief was "based on his dislike of Attorney Zimmerman." Dkt. 161 at 23. But this is a credibility determination for the factfinder.

Hannon also relies on her prior experience with Zimmerman's bills while she was working at the Village of Highwood to support her belief that Zimmerman intentionally overbilled the City. Defendants deny this because Zimmerman and Hannon's time at Highwood did not overlap. Hannon testified, however, that she worked at Highwood after Zimmerman left and gained knowledge of his billing then. Whether her testimony is credible is for the factfinder to decide. In particular, she testified that there was "discussion among the aldermen there, and … his bills were not paid, because he had billed for things that he should not have billed." [Dkt. 166-5 at 60 (Tr. 237:15-22).] It is true, as Defendants point out, that Arnoff's report

concluded that Zimmerman had not intentionally overbilled the City, and the aldermen who weighed in on the issue agreed. [See Dkt. 161 at 23.] But their opinions are not dispositive, and do not address the precise issue raised here: what a reasonable juror might believe. Reasonable jurors could differ on whether it was reasonable for Hannon, at the time she complained, to suspect intentional overbilling in violation of state or federal law.

Defendants also argue that Hannon cannot show a causal connection between her June 7, 2016 email alerting Mayor Helmer and Wade about the Tressler invoice and her termination the next year because Hannon was terminated for rejecting the City's offer of full-time employment. But Defendants do not address the remainder of Hannon's causation theory in the IWA section of their brief: that Wade made a statement to Hannon that was viewed as an overt threat to her job. [See Dkt. 161 at 23.] In particular, Hannon testified that soon after her email about Zimmerman's bills, Wade told her, "if you throw dirt in the air you never know where it will land," which Hannon interpreted as a threat to her job in retaliation for questioning Zimmerman's bills. [Dkt. 166, ¶ 77.] From Hannon's and the Mayor's perspective, they had questioned Zimmerman's compensation, so Wade made an issue of Hannon's compensation by pushing for the creation of a full-time position that would reduce Hannon's pay and make it impossible for her to work at Fox Lake. Wade says his comment was worded slightly differently ("when dirt rises, it flies") and that it referred to a variety of issues, including "the environment created since the issuance

of the RFP." [*Id.*] But who to believe comes down to credibility, which is for the factfinder to decide.

Soon after this conversation, Wade and Williamson raised the issue of Hannon's compensation in the July 2016 executive session. Zimmerman was present and he weighed in. By the conclusion of the meeting, the council was convinced that the finance director position should be full-time. As with the Title VII discrimination claim, a reasonable juror could find that Hannon's position would not have been transitioned but-for Wade's influence over the process, which was allegedly motivated by his desire to get back at Hannon for accusing Zimmerman of fraudulent billing. Wade also decided that outsourcing the role to L&A was the best option because it would save the City money—a fact that Hannon disputes with her own financial analysis. Based on this record, Hannon has enough evidence of a causal connection between her June 7, 2016 email and her termination to take the IWA claim to a jury. Summary judgment on the IWA claim against the City is, therefore, denied.

### 2.     Common Law Retaliatory Discharge

In Count VIII of the complaint, for retaliatory discharge in violation of Illinois common law, Hannon alleges that "Defendants terminated Plaintiff's employment position and refused to allow her to continue her employment in retaliation for her reporting Zimmermann's ongoing fraudulent activity to the Mayor, City Administrator and the City Council." [Dkt. 33, ¶ 215.][6] "Illinois is an at-will

---

[6]     The Whistleblower Act did not preempt or repeal Illinois' common law action for retaliatory discharge. See *Callahan v. Edgewater Care & Rehab. Ctr., Inc.*, 872 N.E.2d 551, 551 (Ill. App. 2007).

employment state, which means that in general an employee can be discharged at any time for any reason or none at all." *Brandon v. Anesthesia & Pain Management Associates, Ltd.*, 277 F.3d 936, 940–41 (7th Cir. 2002) (citing *Pratt v. Caterpillar Tractor Co.*, 500 N.E.2d 1001, 1002 (Ill. App. 1986)). The tort of retaliatory discharge embodies one exception to this rule, allowing an employee to bring a retaliatory discharge claim when she "is fired for refusing to engage in illegal conduct or reporting illegal conduct of others ('whistle blowing' or 'citizen crime fighting')." *Gentile v. County of DuPage*, 583 F. Supp. 3d 1167, 1177 (N.D. Ill. 2022). "A former employee bringing a common-law claim for retaliatory discharge must show: '(1) the employer discharged the employee, (2) in retaliation for the employee's activities, and (3) that the discharge violates a clear mandate of public policy.'" *Perez v. Staples Contract & Commercial LLC*, 31 F.4th 560, 571 (7th Cir. 2022) (citing *Turner v. Mem'l Med. Ctr.*, 911 N.E.2d 369, 374 (2009)). The *McDonnell Douglas* burden-shifting framework does not apply to Illinois retaliatory discharge claims. See *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 774 (7th Cir. 2012). Rather, a plaintiff "must first 'proffer[ ] sufficient evidence from which a reasonable jury could infer that the employer was improperly motivated' before the employer is required to provide a legitimate reason for the termination." *Perez*, 31 F.4th at 571 (quoting *Gordon*, 674 F.3d at 774).

Defendants argue that they are entitled to summary judgment because Hannon cannot satisfy the second and third elements of retaliatory discharge. According to Defendants, Hannon's "report to the City was not of any crime and

Hannon could not have reasonably believed that a simple oversight in billing was criminal in nature." [Dkt. 161 at 24.] Defendants point out that "Illinois courts consistently have refused to expand the tort to encompass a private and individual grievance." *Geary v. Telular Corp.*, 793 N.E.2d 128, 134 (Ill. App. 2003).

For the reasons explained in the preceding section, Hannon has come forward with some evidence that, viewed in the light most favorable to her, is sufficient to take these questions to the jury. The Illinois Supreme Court in *Palmateer v. International Harvester Co.*, 421 N.E.2d 876, 880 (Ill. Sup. Ct. 1981), "established a public policy favoring citizen crime-fighters, and courts have interpreted this to mean that public policy favors the reporting of potentially illegal or improper conduct." *Mackie v. Vaughan Chapter-Paralyzed Veterans of America, Inc.*, 820 N.E.2d 1042, 1051–52 (Ill. App. 2004). In *Palmateer*, "the plaintiff reported a possible violation of the Illinois Criminal Code without any further description of the potential crime, and the supreme court did not mention the crime allegedly committed or the reasonableness of the plaintiff's allegation." *Mackie*, 820 N.E.2d at 1047. Like an employee who reports to law enforcement, "an employee with a reasonable belief that illegal activity is occurring should be able to report his belief to his superiors in an effort to ensure management's compliance with the law without fear of discharge." *Johnson v. World Color Press, Inc.*, 498 N.E.2d 575, 578 (Ill. App. 1986) (citing *Petrik v. Monarch Printing Corp.*, 444 N.E.2d 588, 592 (Ill. App. 1982)). As the Seventh Circuit has put it: "an employee's retaliatory discharge claim should not turn on the happenstance of whether the irregular conduct she reports is actually criminal.

Public policy favors the exposure of apparently criminal activity. That the questionable conduct may later prove to be authorized and therefore legitimate is not dispositive." *Belline v. K-Mart Corp*., 940 F.2d 184, 188–89 (7th Cir. 1991). Further, "[t]hat the illegal act may have involved only a paltry sum makes no difference, for public policy favors the reporting of crimes regardless of their magnitude." *Id.* at 188; see also *Stebbings v. University of Chicago*, 726 N.E.2d 1136, 1145 (Ill. App. 2000) ("The tort of retaliatory discharge will protect the reporting of any violation of the Criminal Code, be it as minor as the theft of a $2 screwdriver.").

The record in this case shows that the Mayor and Zimmerman had an agreement that the Tressler firm would not bill to have a second attorney attend city council meetings. The agreement gave the Mayor discretion over this decision. Despite this, the firm sent the City bills that charged for a second attorney on two occasions; Zimmerman subsequently acknowledged a third billing error, all of which totaled about $2,500. Defendants deny that Zimmerman did this intentionally, but whether Plaintiff reasonably *suspected* Zimmerman of acting intentionally is a question of fact for the jury. The Mayor, and then Hannon, characterized the bills as "fraudulent" and theft, and the Mayor analogized the situation to John Grisham's novel "The Firm." While his comparison might have been hyperbolic and motivated by his dislike of Zimmerman, those are factors for a jury to consider when evaluating the credibility of witnesses and the weight to give other evidence.

Defendants also argue that they are entitled to summary judgment on the causation element because the City had a valid non-pretextual basis for the

discharge: Hannon turned down the full-time salaried finance director position. Defendants maintain that the discharge was "completely unrelated to [Hannon's] actions almost one year earlier in pointing out an outside contractor's billing error." [Dkt. 161 at 25.] But the case Defendants rely on, *McEwen v. Delta Air Lines, Inc.*, 919 F.2d 58 (7th Cir. 1990), is not instructive. There, the plaintiff was an injured employee who could not work, and therefore could not show that her discharge was in retaliation for demanding works' compensation benefits. *Id.* at 60. Here, Hannon could work and wanted to work, but the City eliminated her job and terminated her when she refused to work substantially more hours for less money. Based on these facts, Hannon has enough to survive summary judgment on her theory that she was ultimately discharged in retaliation for complaining about Zimmerman's bills.

### E.    Qualified Immunity

Defendants argue that they are entitled to qualified immunity on Plaintiff's § 1983 claims against Wade and Williamson (only the equal protection claims remain) because "while the council did not technically vote to eliminate Hannon's position or pass an ordinance creating the full-time finance director position, the individual defendants could have reasonably believed" that pursuant to *Bogan v. Scott–Harris,* 523 U.S. 44 (1998), "their discussion during executive session and Wade's act of following the direction he was given by the council were protected by legislative immunity." [Dkt. 161 at 25.] See also *Bogan*, 523 U.S. at 54 ("Local legislators are entitled to absolute immunity from § 1983 liability for their legislative activities.").

"The defense of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Locke v. Haessig*, 788 F.3d 662, 666 (7th Cir. 2015) (quoting *Pearson v. Callahan,* 555 U.S. 223, 231 (2009)). **"In evaluating whether a state actor is entitled to summary judgment for qualified immunity, we consider (1) whether the facts, taken in the light most favorable to the plaintiff, show that the defendant violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Id.* at 666-67.

Defendants do not discuss whether the constitutional right at issue here—the right under the Equal Protection clause to be free from discrimination on the basis of sex in the workplace—was clearly established at the time Hannon was terminated. Nor could they prevail on this issue: it has been clearly established for decades that it is a violation of equal protection to discriminate on the basis of gender in the workplace and that "[t]he same standards for proving intentional discrimination apply to Title VII and § 1983 equal protection claims." *Hildebrandt v. Illinois Dept. of Natural Resources*, 347 F.3d 1014, 1036 (7th Cir. 2003) (citing *Williams v. Seniff*, 342 F.3d 774, 788 n.13 (7th Cir. 2003)); see also *Helland v. South Bend Cmty. Sch. Corp.*, 93 F.3d 327, 329 (7th Cir. 1996) (analyzing Title VII and equal protection together using *McDonnell Douglas* burden shifting method); *Bruno v. City of Crown Point*, 950 F.2d 355, 361 & 363 (7th Cir. 1991) (same); *Friedel v. City of Madison*, 832 F.2d 965, 971–72 (7th Cir. 1987) (same); *Nabozny v. Podlesny,* 92 F.3d 446, 455–56

(7th Cir. 1996) (holding that defendants were not entitled to qualified immunity on student's claim of gender discrimination even though there were no cases directly on point because the Supreme Court in 1971 had established that the Equal Protection Clause "prevent[ed] arbitrary gender-based discrimination" and by 1982 the Supreme Court had held that the Equal Protection Clause "requir[ed] equal treatment regardless of gender"); *Markham v. White,* 172 F.3d 486, 491 (7th Cir. 1999) ("The fact that arbitrary gender-based discrimination … violates the equal protection clause has been plain in this circuit for almost a decade and a half.").

Defendants nonetheless argue that Wade and Williamson are entitled to qualified immunity because they "could have reasonably believed" that their roles in changing Hannon's position, terminating her, and then replacing her with L&A were protected by absolute legislative immunity.[7] But this is not a viable theory of qualified immunity. In assessing qualified immunity, "[t]he question is not whether *rules of individual liability* for the conduct were clearly established at the time. The question is whether *the wrongfulness of the defendant's conduct* was clearly established." *Taylor v. Ways*, 999 F.3d 478, 491 (7th Cir. 2021); see also *id.* ("The Supreme Court has repeatedly described the defense of qualified immunity in terms of whether the

---

[7]     Defendants never argue that they are *actually* entitled to absolute legislative immunity under *Bogan*. They acknowledge that "the council did not technically vote to eliminate Hannon's position or pass an ordinance creating the full-time finance director position" [Dkt. 161 at 25], which is the same point Hannon emphasizes while arguing that *Bogan* does not apply. [See Dkt. 165 at 23.] See also *Bagley v. Blagojevich*, 646 F.3d 378, 392–93 (7th Cir. 2011) (to be regarded as legislative for immunity purposes, act must be substantively legislative, *i.e.* legislative in character, and "'procedurally' legislative, that is, passed by means of established legislative procedures" (quoting *Gallas v. Supreme Court of Pa.*, 211 F.3d 760, 774 (3d Cir. 2000)).

defendant official's 'actions' or "conduct" violated clearly established law, not in terms of whether a defendant should have realized he would be held civilly liable for his actions or conduct."); *Armstrong v. Daily*, 786 F.3d 529, 556 (7th Cir. 2015) ("The issue is not whether issues concerning the availability of a *remedy* are settled. The qualified immunity defense focuses instead on whether the official defendant's *conduct* violated a clearly established constitutional right."); *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) (in deciding immunity, "the focus is on his conduct, not on whether that conduct gave rise to a tort in a particular case"). Thus, Defendants are not entitled to qualified immunity based on the fact that they "might" have believed that absolute legislative immunity under *Bogan* would absolve them of any personal liability under § 1983 for violating a right to equal protection.[8]

## IV.    Conclusion

For these reasons, Defendants' motion for summary judgment [Dkt. 160] is granted in part and denied in part. Summary judgment is granted in favor of Defendants on Plaintiff's claims for retaliation in violation of the Equal Protection Clause (Count III), Title VII (Count IV), the Illinois Human Rights Act (Count V), and the First Amendment (Count VI). Summary judgment is otherwise denied. The claims that remain to be tried are Plaintiff's § 1983 equal protection claim against

---

[8]    At the end of their motion, Defendants argue that the prayer for punitive damages should be stricken because "[t]he evidence here fails to rise to the level to show malice or reckless disregard on the part of Wade or Williamson." [Dkt. 161 at 26.] Defendants do not develop this argument, nor does Hannon respond to it. Without more, the Court declines to rule on the potential availability of punitive damages against the individual Defendants. *Rock Hemp Corp. v. Dunn*, 51 F.4th 693, 704 (7th Cir. 2022) ("'perfunctory and undeveloped arguments, as well as arguments that are unsupported by pertinent authority, are waived'" (quoting *White v. United States*, 8 F.4th 547, 552 (7th Cir. 2021)).

the City, Wade and Williamson (Count I); the Title VII gender discrimination claim against the City (Count II); the Illinois Whistleblower Act claim against the City (Count VII); and the claim against the City for common law retaliatory discharge (Count VIII). Finally, Defendants are not entitled to qualified immunity on the § 1983 claims.

Enter: 18-cv-2475
Date:  June 29, 2023

_____

Lindsay C. Jenkins
United States District Judge

64